UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA

     -v.-

KENNETH CIAPALA,
ULRIK DEBO,
   a/k/a "Molgaard Debo,"
   a/k/a "Ulrik Molgaard," and
BLACKLIGHT, S.A.

      Defendants.

**SEALED INDICTMENT**

19 Cr.

19 CRIM 874

- - - - - - - - - - - - - - - - - X

## COUNT ONE
### (Conspiracy to Commit Securities Fraud)

The Grand Jury charges:

### Relevant Persons and Entities

1.  At all times relevant to this Indictment, BLACKLIGHT
S.A. ("BLACKLIGHT"), the defendant, was a Swiss corporation
based in Geneva, Switzerland that purported to offer asset
management and trustee services to its clients. BLACKLIGHT is
owned and controlled by KENNETH CIAPALA, the defendant, and one
other co-founder and co-principal. Throughout its corporate
existence, as set forth herein, BLACKLIGHT, through CIAPALA and
others, executed stock manipulation schemes relating to the
publicly traded shares of multiple companies and facilitated the
laundering of proceeds from those schemes. Among other things,
BLACKLIGHT set up various nominee entities to help its clients

conceal their ownership of public company shares, and evade SEC reporting requirements, and opened bank accounts and brokerage accounts on behalf of those nominee entities.  BLACKLIGHT executed trades in accounts held by various nominee entities in furtherance of various stock manipulation schemes and received fees and commissions in exchange for its services in advancing those schemes.

2.    At all times relevant to this Indictment, KENNETH CIAPALA, the defendant, a citizen of the United Kingdom and of Switzerland, was a founder and co-principal of BLACKLIGHT S.A., the defendant.

3.    At all times relevant to this Indictment, ULRIK DEBO, a/k/a "Molgaard Debo," a/k/a "Ulrik Molgaard," the defendant, a Danish citizen, resided in Europe and, at certain times relevant to this Indictment, was employed by a Cayman Islands-based financial services firm.

4.    At all times relevant to this Indictment, a co-conspirator not named as a defendant herein ("CC-1"), was a United States citizen and resided in the United States.

5.    At all times relevant to this Indictment, a co-conspirator not named as a defendant herein ("CC-2"), was a United States citizen and, at certain times relevant to this Indictment, resided outside of the United States.

6. At certain times relevant to this Indictment, Company-1 was a publicly traded company based in Pennsylvania that purported to develop mobile technology connecting healthcare providers and consumers to medical transport companies. Shares of Company-1 traded on the over-the-counter ("OTC") market in the United States.

7. At all times relevant to this Indictment, Company-2 was a publicly traded company based in Manhattan, New York that purported to develop treatments for insomnia. Shares of Company-2 traded on the OTC market in the United States.

8. At all times relevant to this Indictment, Company-3 was a privately held company based in California that purported to develop water-based cannabidiol ("CBD") products.

9. At all times relevant to this Indictment, Company-4 was a publicly traded company based in London that purported to engage in gold exploration. Shares of Company-4 traded on the OTC market.

10. At all times relevant to this Indictment, Company-5 was a publicly traded company that was incorporated in Nevada and based in California. Company-5 previously purported to rent hybrid electric and low emission vehicles. As of in or about October 2019, Company-5 purported to be engaged in plans to sell bottled CBD-infused water and energy drinks. Shares of Company-5 traded on the OTC market.

3

## The Scheme to Defraud

11.   From at least in or about 2013, up to and including at least in or about July 2019, KENNETH CIAPALA, ULRIK DEBO, a/k/a "Molgaard Debo," a/k/a "Ulrik Molgaard," and BLACKLIGHT S.A., the defendants, and others known and unknown, conspired to defraud the investing public by orchestrating and facilitating multiple stock manipulation schemes, commonly referred to as "pump and dump" schemes.

12.   In executing these pump and dump schemes, KENNETH CIAPALA, ULRIK DEBO, a/k/a "Molgaard Debo," a/k/a "Ulrik Molgaard," and BLACKLIGHT S.A., the defendants, and their co-conspirators generally utilized the following steps:   (1) they secretly amassed beneficial ownership of all, or substantially all, of the stock of certain publicly traded companies; (2) they then manipulated the price and demand for the stocks of those companies, including through the release of materially false information to the investing public, causing the stock prices to become artificially inflated; and (3) the defendants sold out of their secretly-amassed positions at these inflated values at the expense of the investing public.

13.   The vast majority of the securities that KENNETH CIAPALA, ULRIK DEBO, a/k/a "Molgaard Debo," a/k/a "Ulrik Molgaard," and BLACKLIGHT S.A., the defendants, and others known and unknown, conspired to manipulate were "penny" or "microcap"

4

stocks that traded in the United States on the OTC market.
These securities were issued by small companies, were thinly
traded, and typically traded at less than $1 per share.  Thus,
these securities were particularly susceptible to manipulation.

## Overview of the Defendants' Roles in the Scheme to Defraud

14.  KENNETH CIAPALA, the defendant, primarily furthered
the stock manipulation scheme by, among other things, using
BLACKLIGHT S.A., the defendant, and helping others, including
ULRIK DEBO, a/k/a "Molgaard Debo," a/k/a "Ulrik Molgaard," the
defendant, to obscure their beneficial ownership and control of
all or substantially all of the shares of companies ("issuers")
whose securities they sought to manipulate.  CIAPALA caused
BLACKLIGHT to establish nominee entities that were registered in
the names of various third parties (the "Nominee Entities") to
hold the shares that were, in truth and in fact, beneficially
owned and controlled by the scheme participants.  CIAPALA also
caused BLACKLIGHT to open bank accounts in the names of these
Nominee Entities and to trade shares owned by the Nominee
Entities through various brokerage accounts.  Through
BLACKLIGHT, CIAPALA exercised trading authority over the Nominee
Entities' shares and CIAPALA directed brokers to execute trades
on behalf of these Nominee Entities in furtherance of the stock
manipulation scheme.  Certain of these trades were executed in
Manhattan, New York.  CIAPALA, through BLACKLIGHT, received fees

5

and a share of the illicit profits generated by the scheme's
manipulative trading.

15.   ULRIK DEBO, a/k/a "Molgaard Debo," a/k/a "Ulrik
Molgaard," the defendant, furthered the stock manipulation
scheme by, among other things, identifying a suitable publicly
traded shell company that could be used in the scheme;
identifying, in certain instances, a suitable privately held
company to engage in a "reverse merger" with the shell company;
obtaining financing to purchase all or substantially all of the
outstanding shares of the shell company issuer; causing Nominee
Entities to obtain ownership of the issuer's shares; identifying
and paying "promoters" that issued exaggerated and, at times,
false press releases about the issuer in order to raise the
trading price and volume of the issuer's shares; and identifying
and paying various "trading specialists" who assisted in
artificially manipulating the trading volume and price of the
issuer's shares.

### Use of Nominee Entities to Secretly Amass Shares

16.   In furtherance of the conspiracy and scheme to
defraud, KENNETH CIAPALA, ULRIK DEBO, a/k/a "Molgaard Debo,"
a/k/a "Ulrik Molgaard," and BLACKLIGHT S.A., the defendants, and
others known and unknown, secretly amassed beneficial ownership
and control of all or substantially all of the stock of the
issuers whose stock they planned to manipulate.   In order to

6

obscure their ownership interests, CIAPALA, DEBO, BLACKLIGHT and others caused these shares to be held in the names of multiple Nominee Entities.  Additionally, CIAPALA, DEBO, BLACKLIGHT and others caused the Nominee Entities' holdings to be structured in such a way so as to ensure that no single Nominee Entity held more than five percent of the outstanding stock of any of the issuers.

## The Reverse Merger Transactions

17.  As a further part of the conspiracy and the scheme to defraud, KENNETH CIAPALA, ULRIK DEBO, a/k/a "Molgaard Debo," a/k/a "Ulrik Molgaard," and BLACKLIGHT S.A., the defendants, and others, on multiple occasions, caused publicly traded shell companies with few, if any, assets to reverse merge with privately held companies that typically were in industries likely to attract the investing public's interest, such as CBD products, blockchain, and gold mining.  In connection with the reverse mergers, CIAPALA, DEBO, BLACKLIGHT, and others caused various filings to be made with the United States Securities and Exchange Commission (the "SEC") that contained material misrepresentations and omissions.  For example, when disclosing which shareholders held more than five percent of the relevant company's stock, these filings concealed that the co-conspirators beneficially owned more than five percent of the stock, which they controlled through nominee brokerage accounts.

7

**Manipulation of the Issuers' Stock Prices and Trading Volume**

18.   After KENNETH CIAPALA, ULRIK DEBO, a/k/a "Molgaard
Debo," a/k/a "Ulrik Molgaard," and BLACKLIGHT S.A., the
defendants, and others participating in the scheme had obtained
control of all or substantially all of the shares of an issuer
and, in certain instances, after the completion of a reverse
merger, the scheme participants manipulated the trading price
and volume for the stock of the issuer. CIAPALA, DEBO,
BLACKLIGHT and others typically manipulated the price and volume
by, among other things, causing promotional materials to be
distributed to the investing public that contained exaggerated
and, at times, false claims about the issuer. CIAPALA, DEBO,
BLACKLIGHT and others concealed from the investing public the
fact that these promotional materials were financed and created
at the direction of those who beneficially owned and controlled
substantially all of the shares of the relevant issuers.

19.   KENNETH CIAPALA, ULRIK DEBO, a/k/a "Molgaard Debo,"
a/k/a "Ulrik Molgaard," and BLACKLIGHT S.A., the defendants, and
others also engaged in manipulative trading activity in order to
artificially increase the trading volume and share price of the
issuers whose stock they sought to manipulate.  Certain of these
trades were executed in Manhattan, New York, as well as
elsewhere in the United States.  For example:

8

a.   CIAPALA, DEBO, BLACKLIGHT, and others caused Nominee Entities subject to their control to engage in "match" trades in which they caused multiple Nominee Entities they controlled to essentially trade with one another to create the appearance of trading volume and demand for the stock at issue. For instance, the defendants frequently caused one Nominee Entity they controlled to place a buy order for a certain quantity of shares at a particular, often above-market, price, and another Nominee Entity they controlled to place a matching sell order for a similar quantity of shares at a similar price. The match trades had the effect of increasing trading price and volume of the manipulated stock and of making it appear to the investing public that such increases were driven by actual market interest in the stock rather than coordinated and contrived trades between Nominee Entities controlled by the defendants and their co-conspirators.

b.   In addition, CIAPALA, DEBO, BLACKLIGHT and others took steps to ensure that a given stock they were manipulating closed "in the green," meaning that the stock's closing price at the end of the trading day exceeded the opening price at the beginning of the trading day.  The scheme participants manipulated the stock's share price in this fashion in order to make it appear that the stock's share price was consistently increasing over time due to actual market demand so that the

9

stock would be more attractive to the investing public.    In
order to accomplish the goal of having the stock close "in the
green," the scheme participants engaged in manipulative trading
at or near the close of the trading day.

## **Manipulation of the Shares of Particular Issuers**

20.   As part of the scheme, KENNETH CIAPALA, ULRIK DEBO,
a/k/a "Molgaard Debo," a/k/a "Ulrik Molgaard," and BLACKLIGHT
S.A., the defendants, and others sought to manipulate the shares
of, among others, the issuers set forth below.

### **Company-1**

21.   From at least in or about September 2014, up to and
including at least in or about April 2016, KENNETH CIAPALA and
BLACKLIGHT S.A., the defendants participated in a scheme with
CC-2 to manipulate the trading price and volume of the stock of
Company-1.   In connection with that scheme, CC-2 used multiple
Nominee Entities that had been established by CIAPALA, through
BLACKLIGHT, to hold shares of Company-1.   CC-2 directed CIAPALA
to execute trades on behalf of these Nominee Entities through
brokerage accounts that CIAPALA and BLACKLIGHT controlled,
including accounts serviced by brokers based in Manhattan, New
York.   CIAPALA knew that the Nominee Entities utilized by CC-2
to trade in Company-1's shares were, in truth and in fact, all
controlled by CC-2 despite the fact that these entities were
purportedly owned and controlled by separate individuals.

CIAPALA also knew that the trade orders that he was causing to be executed in the multiple Nominee Entity accounts were all at the direction of CC-2.

22.  Subsequently, KENNETH CIAPALA, the defendant, introduced CC-2 to CC-1 for the purpose of having CC-1 act as a "trading specialist" in return for a fee.  In that role, CC-1 assisted CC-2 in directing trades in a manner that manipulated the share price and trading volume of Company-1's stock. CIAPALA and BLACKLIGHT thereafter continued to execute trades on behalf of CC-2's Nominee Entities in furtherance of the scheme as directed by CC-2.  The fees that were paid by CC-2 to CC-1 in connection with the scheme were wired from CC-2's accounts held at BLACKLIGHT.  These wire transfers were caused by CIAPALA or other employees at BLACKLIGHT and were executed, in part, through Manhattan, New York.  At the time he caused these wire transfers to occur, CIAPALA knew that the purpose of these payments to CC-1 was to compensate him for his role in manipulating the share price and trading volume of Company-1's stock.

## Company-2

23.  From at least in or about 2013, up to and including at least in or about 2017, KENNETH CIAPALA, ULRIK DEBO, a/k/a "Molgaard Debo," a/k/a "Ulrik Molgaard," and BLACKLIGHT S.A., the defendants, and others known and unknown, schemed to

11

manipulate the trading price and volume of the stock of Company-2. In furtherance of the scheme, DEBO, working with CC-1, among others, caused funds to be transferred, including through wire transfers that were executed, in part, through Manhattan, New York, in order to obtain beneficial ownership and control of all or substantially all of the outstanding shares of Company-2.

24. KENNETH CIAPALA, ULRIK DEBO, a/k/a "Molgaard Debo," a/k/a "Ulrik Molgaard," and BLACKLIGHT S.A., the defendants, and others known and unknown, thereafter caused the shares of Company-2 that they controlled to be held in the names of multiple Nominee Entities, including Nominee Entities that CIAPALA controlled through BLACKLIGHT. The shares were spread among the various Nominee Entities in order to obscure the fact that, in reality, CIAPALA, DEBO, and the other scheme participants controlled the shares' disposition.

25. In or about March 2016, in furtherance of the scheme to manipulate the trading price and volume of Company-2, KENNETH CIAPALA, and BLACKLIGHT S.A., the defendants, working with CC-1, among others, caused Nominee Entities subject to their control to engage in match trades with another entity controlled by an associate of CC-1 ("Associate-1") that was, in truth and in fact, purchasing Company-2's shares at the direction of CIAPALA and CC-1. In particular:

12

      a.    CIAPALA and BLACKLIGHT caused Nominee Entities that they controlled to place sell orders of Company-2's shares in certain specified quantities at a particular price and CC-1, with CIAPALA's knowledge, instructed Associate-1 to have an entity Associate-1 controlled place a matching buy order for a similar quantity of shares at a similar price.

      b.    CIAPALA, BLACKLIGHT, and CC-1, in truth and in fact, were secretly financing the purchases of shares by Associate-1 such that, after the match trades were completed in the open market, CIAPALA and BLACKLIGHT caused funds to be transferred to an entity Associate-1 controlled to pay for approximately 70 percent of the gross sales of the Company-2 shares.  Accordingly, CIAPALA, BLACKLIGHT, and CC-1 were not only controlling the timing, quantity and price of the selling and buying of the Company-2 shares, but also were paying kickbacks to Associate-1 to repay him for participating in the match trades at their direction.

      c.    Additionally, CC-1, with the knowledge of KENNETH CIAPALA, the defendant, instructed Associate-1 to not sell the shares of Company-2 that Associate-1 had acquired through the aforementioned match trades into the market.  Associate-1 ultimately agreed to not sell the shares until CC-1 instructed him otherwise.  This allowed CIAPALA and CC-1 to keep the shares of Company-2 under CIAPALA and CC-1's control.

**Company-5**

26. Beginning in or about September 2018 and continuing
through at least in or about December 2019, KENNETH CIAPALA,
ULRIK DEBO, a/k/a "Molgaard Debo," a/k/a "Ulrik Molgaard," and
BLACKLIGHT S.A., the defendants, and others known and unknown,
schemed to manipulate the trading price and volume of the stock
of Company-4 and Company-5.  In furtherance of the scheme, DEBO,
initially identified Company-4 as a publicly traded shell
company that the group could obtain control of and cause to
engage in a reverse merger with Company-3, a privately held
company.  DEBO later indicated that the group would instead
utilize Company-5 as the publicly traded shell company into
which Company-3 could be merged.

27. In order to obtain control of all of the free trading
shares of Company-5, ULRIK DEBO, a/k/a "Molgaard Debo," a/k/a
"Ulrik Molgaard," the defendant, with the knowledge and
agreement of KENNETH CIAPALA, the defendant, instructed CC-1 to
wire funds to a bank account designated by DEBO as partial
payment for control of Company-5 in preparation for the
manipulation of Company-5's stock's after it merged with
Company-3.  In order to facilitate the reverse merger, DEBO
caused attorneys to prepare various necessary agreements,
documents, and filings with respect to Company-5, including
documents filed with the OTC Markets Group, Inc. ("OTC

14

Markets"), a company in the United States that administers the OTC market.

28. For example, in or about October 2019, ULRIK DEBO, a/k/a "Molgaard Debo," a/k/a "Ulrik Molgaard," the defendant, caused various documents relating to listing of shares of Company-5 to be filed with OTC Markets and made accessible to the investing public on OTC Markets' website. These publicly available documents included Company-5's financial statements, as well as multiple "Disclosure Statements Pursuant to the Pink Basic Disclosure Guidelines," a form OTC Markets disclosure filing, including for the period ending June 30, 2019. KENNETH CIAPALA, the defendant, was apprised of the fact that DEBO had caused the aforementioned filings to be made.

29. In connection with the scheme, KENNETH CIAPALA and BLACKLIGHT S.A., the defendants, made available multiple Nominee Entities to hold and trade shares of Company-5. Additionally, in order to manipulate the trading price and volume of the relevant stock, CIAPALA and ULRIK DEBO, a/k/a "Molgaard Debo," a/k/a "Ulrik Molgaard," the defendant, identified and agreed to provide payment to a stock promoter who, in connection with the stock manipulation scheme, was engaged to issue exaggerated and misleading press releases following the planned reverse merger. CIAPALA and DEBO also made plans to work with CC-1 as a "trading specialist" in order to engage in manipulative trading activity

to artificially increase the trading volume and share price of the relevant shares, including through match trades between Nominee Entities.

## Laundering the Profits from the Scheme, Including Through BLACKLIGHT

30. After the scheme participants artificially inflated the share prices of the relevant issuers' stock, they profited from the scheme by selling the shares they beneficially owned and controlled into the market at these artificial prices. By selling these shares while the trading price was artificially inflated through their manipulative trading activity, the scheme participants reaped millions in illicit profits.

31. After these crime proceeds were generated, KENNETH CIAPALA and BLACKLIGHT S.A., the defendants, assisted the other scheme participants, including ULRIK DEBO, a/k/a "Molgaard Debo," a/k/a "Ulrik Molgaard," the defendant, in obtaining their cut of these proceeds by remitting these illicit funds to them in a manner designed to conceal the source of these funds or the identity of the recipients thereof, including through transfers that were executed, in part, through accounts located in Manhattan, New York. With CIAPALA's knowledge and, at times, at CIAPALA's direction, these transfers were executed in a manner intended to conceal the true source of these funds and the recipients of the funds by, for instance (1) using fabricated

invoices to justify wire transfers from accounts held in the
names of the Nominee Entities, controlled and operated by
BLACKLIGHT, to other bank accounts controlled by the scheme
participants and (2) transferring the proceeds immediately to
third-party sellers of assets, including high-end luxury goods
and luxury automobiles, on behalf of the scheme participants for
the purchase of these items, but without the transfers passing
through any accounts associated with the participants.

## Statutory Allegations

32.  From at least in or about 2013, up to and including in
or about December 2019, in the Southern District of New York,
and elsewhere, KENNETH CIAPALA, ULRIK DEBO, a/k/a "Molgaard
Debo," a/k/a "Ulrik Molgaard," and BLACKLIGHT S.A., the
defendants, and others known and unknown, willfully and
knowingly combined, conspired, confederated, and agreed together
and with each other to commit offenses against the United
States, to wit, securities fraud, in violation of Title 15,
United States Code, Sections 78j(b) and 78ff, and Title 17, Code
of Federal Regulations, Section 240.10b-5.

33.  It was a part and an object of the conspiracy that
KENNETH CIAPALA, ULRIK DEBO, a/k/a "Molgaard Debo," a/k/a "Ulrik
Molgaard," and BLACKLIGHT S.A., the defendants, and others known
and unknown, willfully and knowingly, directly and indirectly,
by use of the means and instrumentalities of interstate

17

commerce, the mails, and the facilities of national securities exchanges, would and did use and employ, in connection the purchase and sale of securities, manipulative and deceptive devices and contrivances in violation of Title 17, Code of Federal Regulations, Section 240.10b-5, by (a) employing devices, schemes, and artifices to defraud; (b) making and causing to be made untrue statements of material fact and omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon persons, in violation of Title 15, United States Code, Sections 78j(b) and 78ff; and Title 17, Code of Federal Regulations, Section 240.10b-5.

34. It was further a part and an object of the conspiracy that KENNETH CIAPALA, ULRIK DEBO, a/k/a "Molgaard Debo," a/k/a "Ulrik Molgaard," and BLACKLIGHT S.A., the defendants, and others known and unknown, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, would and did transmit and cause to be transmitted by means of wire and radio communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose

18

of executing such scheme and artifice, in violation of Title 18,
United States Code, Section 1343.

## Overt Acts

35.   In furtherance of the conspiracy and to effect the
illegal objects thereof, the following overt acts, among others,
were committed in the Southern District of New York and
elsewhere:

a.   In or about August 2015, KENNETH CIAPALA and
BLACKLIGHT S.A., the defendants, caused a broker to execute
trade orders using a Nominee Entity to artificially manipulate
the trading price and volume of Company-1's stock, and certain
of these trade orders were executed in Manhattan, New York.

b.   On or about July 7, 2015, CIAPALA and BLACKLIGHT
caused $400,000 of proceeds of the sale of Company-1 stock to be
wired from a nominee account controlled by CIAPALA to a third
party account, which wire passed through Manhattan, New York.

c.   In or about November 2015, CIAPALA and BLACKLIGHT
caused a wire transfer to be sent from a third party account to
a Nominee Entity controlled by CIAPALA and BLACKLIGHT in
connection with the scheme to artificially manipulate the
trading price and volume of Company-2's stock, which wire was
executed, in part, through Manhattan, New York.

d.   In or about March 2016, CIAPALA and BLACKLIGHT,
and others known and unknown caused a broker to execute trade

19

orders using a Nominee Entity to artificially manipulate the trading price and volume of Company-2's stock, and certain of these trade orders were executed in Manhattan, New York.

e.    On or about April 16, 2019, ULRIK DEBO, a/k/a "Molgaard Debo," a/k/a "Ulrik Molgaard," the defendant, instructed CC-1 to wire funds to a bank account designated by DEBO ("Bank Account-1") in preparation for the manipulation of Company-3's stock after its merger into Company-4 or Company-5.

f.    On or about April 26, 2019, CC-1 caused $50,000 to be wired to Bank Account-1, which wire was executed, in part, through Manhattan, New York.

g.    On or about May 14, 2019, DEBO instructed CC-1 to wire additional funds to a different bank account designated by DEBO ("Bank Account-2") in order to prepare for the manipulation of Company-3's stock after its merger into Company-4 or Company-5.

h.    On or about May 15, 2019, CC-1 caused $50,000 to be wired to Bank Account-2, which wire was executed, in part, through Manhattan, New York.

i.    On or about June 11, 2019, CIAPALA spoke by telephone with CC-1, who at the time was located in Manhattan, New York, and informed CIAPALA of his presence there.  CIAPALA and CC-1 discussed their plan to manipulate the trading price

and trading volume of the stock of Company-4, and subsequently, Company-5 after the planner reverse merger with Company-3.

j.    On or about June 12, 2019, DEBO again spoke by telephone with CC-1, who at the time was located in Manhattan, New York, and informed DEBO of his presence there.  DEBO and CC-1 discussed their plan to manipulate the trading price and trading volume of Company-3's stock after its merger into Company-4 or Company-5.

k.    On or about June 14, 2019, DEBO sent CC-1 an email attaching a draft Disclosure Statement Pursuant to the Pink Basic Disclosure Guidelines to OTC Markets for Company-5 in connection with their plan to manipulate the trading price and trading volume of Company-5's stock.

l.    On or about June 17, 2019, DEBO spoke by telephone with CC-1 and confirmed that they would utilize Company-5 as a publicly traded shell company for the stock manipulation scheme.

m.    In or about October 2019, in connection with the plan to manipulate the trading price and trading volume of Company-5's stock, DEBO caused various filings to be made with OTC Markets with respect to Company-5 that were reviewed and acted upon by employees of OTC Markets based in Manhattan, New York and elsewhere.

(Title 18, United States Code, Section 371.)

21

## COUNT TWO
### (Conspiracy to Commit Wire Fraud])

The Grand Jury further charges:

36.    The allegations contained in paragraphs 1 through 31,
and 35 above are hereby repeated, re-alleged, and incorporated
by reference as if fully set forth herein.

37.    From at least in or about 2013, up to and including in
or about December 2019, in the Southern District of New York,
and elsewhere, KENNETH CIAPALA, ULRIK DEBO, a/k/a "Molgaard
Debo," a/k/a "Ulrik Molgaard," and BLACKLIGHT S.A., the
defendants, and others known and unknown, willfully and
knowingly combined, conspired, confederated, and agreed together
and with each other to commit wire fraud, in violation of Title
18, United States Code, Section 1343.

38.    It was a part and an object of the conspiracy that
KENNETH CIAPALA, ULRIK DEBO, a/k/a "Molgaard Debo," a/k/a "Ulrik
Molgaard," and BLACKLIGHT S.A., the defendants, and others known
and unknown, willfully and knowingly, having devised and
intending to devise a scheme and artifice to defraud, and for
obtaining money and property by means of false and fraudulent
pretenses, representations, and promises, would and did transmit
and cause to be transmitted by means of wire and radio
communication in interstate and foreign commerce, writings,
signs, signals, pictures, and sounds for the purpose of

22

executing such scheme and artifice, in violation of Title 18,
United States Code, Section 1343.

(Title 18, United States Code, Section 1349.)

## COUNT THREE
### (Securities Fraud - Company-1)

The Grand Jury further charges:

39.    The allegations contained in paragraphs 1 through 31,
and 35 are hereby repeated, re-alleged, and incorporated by
reference as if fully set forth herein.

40.    From at least in or about September 2014, up to and
including at least in or about April 2016, in the Southern
District of New York and elsewhere, KENNETH CIAPALA and
BLACKLIGHT S.A., the defendants, willfully and knowingly,
directly and indirectly, by the use of means and
instrumentalities of interstate commerce, and the mails and
facilities of national securities exchanges, did use and employ,
and cause to be used and employed, in connection with the
purchase and sale of securities, manipulative and deceptive
devices and contrivances in contravention of Title 17, Code of
Federal Regulations, Section 240.10b-5, by (a) employing
devices, schemes, and artifices to defraud; (b) making untrue
statements of material fact and omitting to state material facts
necessary in order to make the statements made, in light of the
circumstances under which they were made, not misleading; and

23

(c) engaging in acts, practices and courses of business which operated and would operate as a fraud and deceit upon persons, and aided and abetted the same, to wit, CIAPALA, BLACKLIGHT, and others schemed to manipulate the trading price and trading volume of Company-1's stock.

(Title 15, United States Code, Sections 78j(b) & 78ff; Title 17, Code of Federal Regulations, Section 240.10b-5; and Title 18, United States Code, Section 2.)

## COUNT FOUR
### (Securities Fraud - Company-2)

The Grand Jury further charges:

41.   The allegations contained in paragraphs 1 through 31, and 35 above are hereby repeated, re-alleged, and incorporated by reference as if fully set forth herein.

42.   From at least in or about 2013, up to and including at least in or about 2017, in the Southern District of New York and elsewhere, KENNETH CIAPALA, ULRIK DEBO, a/k/a "Molgaard Debo," a/k/a "Ulrik Molgaard," and BLACKLIGHT S.A., the defendants, and others known and unknown, willfully and knowingly, directly and indirectly, by the use of means and instrumentalities of interstate commerce, and the mails and facilities of national securities exchanges, did use and employ, and cause to be used and employed, in connection with the purchase and sale of securities, manipulative and deceptive devices and contrivances in contravention of Title 17, Code of Federal Regulations,

24

Section 240.10b-5, by (a) employing devices, schemes, and artifices to defraud; (b) making untrue statements of material fact and omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices and courses of business which operated and would operate as a fraud and deceit upon persons, and aided and abetted the same, to wit, CIAPALA, DEBO, BLACKLIGHT, and others schemed to manipulate the trading price and trading volume of Company-2's stock.

(Title 15, United States Code, Sections 78j(b) & 78ff;
Title 17, Code of Federal Regulations, Section 240.10b-5;
and Title 18, United States Code, Section 2.)

## COUNT FIVE
### (Securities Fraud - Company-4 and Company-5)

The Grand Jury further charges:

43. The allegations contained in paragraphs 1 through 31, and 35 above are hereby repeated, re-alleged, and incorporated by reference as if fully set forth herein.

44. From at least in or about September 2018 up to and including at least in or about December 2019, in the Southern District of New York and elsewhere, KENNETH CIAPALA, ULRIK DEBO, a/k/a "Molgaard Debo," a/k/a "Ulrik Molgaard," and BLACKLIGHT S.A., the defendants, willfully and knowingly, directly and indirectly, by the use of means and instrumentalities of

interstate commerce, and the mails and facilities of national securities exchanges, attempted to use and employ, did use and employ, and cause to be used and employed, in connection with the purchase and sale of securities, manipulative and deceptive devices and contrivances in contravention of Title 17, Code of Federal Regulations, Section 240.10b-5, by (a) employing devices, schemes, and artifices to defraud; (b) making untrue statements of material fact and omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices and courses of business which operated and would operate as a fraud and deceit upon persons, and aided and abetted the same, to wit, CIAPALA, DEBO, BLACKLIGHT, and others schemed to manipulate the trading price and trading volume of the stock of Company-4 and, ultimately, Company-5.

(Title 15, United States Code, Sections 78j(b) & 78ff; Title 17, Code of Federal Regulations, Section 240.10b-5; and Title 18, United States Code, Section 2.)

## COUNT SIX
### (Wire Fraud)

The Grand Jury further charges:

45.  The allegations contained in paragraphs 1 through 31, and 35 above are hereby repeated, re-alleged, and incorporated by reference as if fully set forth herein.

26

46. From at least in or about 2013, up to and including at least in or about July 2019, in the Southern District of New York and elsewhere, KENNETH CIAPALA, ULRIK DEBO, a/k/a "Molgaard Debo," a/k/a "Ulrik Molgaard," and BLACKLIGHT S.A., the defendants, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations and promises, transmitted and caused to be transmitted by means of wire and radio communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, to wit, CIAPALA, DEBO, and BLACKLIGHT engaged in a scheme to manipulate the trading price and trading volume for the common stock of various publicly traded companies, which scheme involved the use of wires.

(Title 18, United States Code, Section 1343 and 2.)

## COUNT SEVEN
### (Conspiracy to Commit Concealment Money Laundering)

The Grand Jury further charges:

47. The allegations contained in paragraphs 1 through 31, and 35 above are hereby repeated, re-alleged, and incorporated by reference as if fully set forth herein.

48. From at least in or about 2013, up to and including at least in or about December 2019, in the Southern District of New

York and elsewhere, KENNETH CIAPALA and BLACKLIGHT S.A., the defendants, and others known and unknown, knowingly combined, conspired, confederated, and agreed together and with each other to violate Title 18, United States Code, Section 1956(a)(1)(B)(i).

49. It was a part and an object of the conspiracy that KENNETH CIAPALA and BLACKLIGHT S.A., the defendants, and others known and unknown, knowing that the property involved in certain financial transactions, to wit, wire transfers to bank accounts controlled by the scheme participants and transfers to purchase assets for scheme participants, represented the proceeds of some form of unlawful activity, would and did conduct and attempt to conduct such financial transactions, which in fact involved the proceeds of specified unlawful activity as defined in 18 U.S.C. § 1956(c)(7), to wit, fraud in the sale of securities and wire fraud, knowing that the transactions were designed in whole or in part to conceal and disguise the nature, location, source, ownership and control or the proceeds of specified unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i).

(Title 18, United States Code, Section 1956(h).)

28



## COUNT EIGHT
### (Concealment Money Laundering)

The Grand Jury further charges:

50. The allegations contained in paragraphs 1 through 31, and 35 above are hereby repeated, re-alleged, and incorporated by reference as if fully set forth herein.

51. From at least in or about 2013, up to and including at least in or about December 2019, in the Southern District of New York and elsewhere, KENNETH CIAPALA and BLACKLIGHT S.A., the defendants, knowing that the property involved in certain financial transactions, to wit, wire transfers to bank accounts controlled by the scheme participants and transfers to purchase assets for scheme participants, represented the proceeds of some form of unlawful activity, would and did conduct and attempt to conduct such financial transactions, which in fact involved the proceeds of specified unlawful activity as defined in 18 U.S.C. § 1956(c)(7), to wit, proceeds from offenses involving fraud in the sale of securities and wire fraud, knowing that the transactions were designed in whole or in part to conceal and disguise the nature, location, source, ownership and control or the proceeds of specified unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i).

(Title 18, United States Code, Section 1956(a)(1)(B)(i).)



## FORFEITURE ALLEGATIONS

52. As a result of committing one or more of the offenses alleged in Counts One through Six of this Indictment, KENNETH CIAPALA, ULRIK DEBO, a/k/a "Molgaard Debo," a/k/a "Ulrik Molgaard," and BLACKLIGHT S.A., the defendants, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461, any and all property, real and personal, that constitutes or is derived from proceeds traceable to the commission of said offenses, including but not limited to, a sum of money in United States currency representing the amount of proceeds traceable to the commission of said offenses.

53. As a result of committing one or more of the offenses alleged in Counts Seven and Eight of this Indictment, KENNETH CIAPALA and BLACKLIGHT S.A., the defendants, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 982(a)(1), any property, real and personal, involved in said offenses, or any property traceable to such property, including but not limited to a sum in United States currency representing the amount of property involved in said offenses.

### Substitute Assets Provision

54. If any of the above-described forfeitable property, as a result of any act or omission of KENNETH CIAPALA, ULRIK DEBO,



a/k/a "Molgaard Debo," a/k/a "Ulrik Molgaard," and BLACKLIGHT
S.A., the defendants:

a.   cannot be located upon the exercise of due
diligence;

b.   has been transferred or sold to, or deposited
with, a third person;

c.   has been placed beyond the jurisdiction of the
Court;

d.   has been substantially diminished in value; or

e.   has been commingled with other property which
cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to Title 21,
United States Code, Section 853(p), and Title 28, United States
Code, Section 2461, to seek forfeiture of any other property of
the defendant up to the value of the above forfeitable property.

(Title 18, United States Code, Sections 981, 982; Title 21,
United States Code, Section 853; and
Title 28, United States Code, Section 2461.)

FOREPERSON

GEOFFREY S. BERMAN
United States Attorney

31


Form No. USA-33s-274 (Ed. 9-25-58)

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK**

**UNITED STATES OF AMERICA**

- v. -

**KENNETH CIAPALA,
ULRIK DEBO,
a/k/a "Molgaard Debo,"
a/k/a "Ulrik Molgaard," and
BLACKLIGHT S.A.**

**Defendants.**

**SEALED INDICTMENT**

19 Cr. ___

(15 U.S.C. §§ 78j(b) & 78ff; 17 C.F.R.
§§ 240.10b-5;
18 U.S.C. §§ 371, 1343, 1349,
1956(a)(1)(B)(i), 1956(h) & 2.)

GEOFFREY S. BERMAN
United States Attorney.

**A TRUE BILL**

_____
FOREPERSON